**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| L.A., on behalf of her minor son A.A.,<br><br>Plaintiff,<br><br>v.<br><br>The New York City Department of Education, Melissa Aviles-Ramos, as Chancellor of New York City Public Schools, and Roderick Palton, as Superintendent of District 31, Jessica S. Tisch, Commissioner of the New York City Police Department, and the New York City Police Department,<br>Defendants. | Case No. 1:25-cv-6697<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiff L.A., on behalf of her minor son A.A., through undersigned counsel, brings this action against the New York City Department of Education, Melissa Aviles-Ramos in her official capacity as Chancellor of New York City Public Schools, Roderick Palton in his official capacity as Superintendent of District 31, the New York City Police Department, and Jessica S. Tisch, in her official capacity as Commissioner of the New York City Police Department (collectively the "Defendants"), asserting claims for violations of Section 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act, the Fourth Amendment to the United States Constitution, Article I, Section 12 of the New York State Constitution, the New York State Human Rights Law, the New York City Human Rights Law, and New York common law.

## PRELIMINARY STATEMENT

1.      This action seeks to remedy the unlawful use of physical and mechanical restraints on children with disabilities in New York City Public Schools.

1

2. Plaintiff A.A. is a sixteen-year-old student diagnosed with Level 3 autism spectrum disorder ("ASD"), the most significant level of ASD. A.A. is minimally verbal and requires substantial support to access education, including a free appropriate public education ("FAPE").

3. A.A. attends the Alternate Assessment program at Tottenville High School ("School") on Staten Island. New York State's Alternate Assessment programs serve children with significant disabilities who require intensive specialized instructional support.

4. On December 9, 2024, A.A. was returning from gym with his classmates, the classroom paraprofessional, and his assigned 1:1 paraprofessional, Angelo Novello. As he entered the stairwell, A.A. tapped the classroom paraprofessional on each of her shoulders—conduct explicitly noted in his Behavior Intervention Plan. Instead of implementing redirection, Angelo, a recent high school graduate with no meaningful training, slapped A.A.'s hand and violently restrained A.A. by pressing him face-first against a wall and pinning both of his elbows into A.A.'s neck.

5. Subsequently, Dean Matthew Galati arrived on the scene and proceeded to place his arm around A.A.'s neck, placing A.A. in a chokehold.

6. Finally, School Safety Agent L. Rivera placed a distraught A.A. in metal handcuffs. As a direct result of these unlawful restraints, A.A. suffered physical injuries and lasting emotional trauma.

7. While A.A. remained handcuffed, Angelo called L.A. and falsely claimed that A.A. had smacked him and attempted to bite and headbutt him without provocation. Subsequent review of school surveillance video directly contradicted this account.

8. Following the incident, A.A. repeatedly complained about neck and wrist pain. He became fearful of returning to school. Upon A.A.'s return to school, he exhibited significant

regression, including aggressive and maladaptive behaviors, such as punching and throwing himself on the floor. At home, he lost independence in daily living skills.

9.     The School's principal later conceded that the initial report from Angelo regarding the incident was inaccurate. School staff subsequently promised to assign A.A. to a more experienced paraprofessional and to prohibit Dean Galati from having further contact with A.A.

10.     New York State Department of Education ("NYSED") regulations unequivocally mandate that de-escalation take precedence over restraint. Physical restraint is permissible only when less restrictive interventions cannot prevent an imminent risk of serious harm.[1] Moreover, unless effectuating a lawful arrest, school resource officers are bound by NYSED regulations, including the prohibition on the use of mechanical restraint such as handcuffs.[2]

11.     As Assistant Attorney General Harmeet K. Dhillon of the Justice Department's Civil Rights Division has emphasized, "[s]tudents with disabilities should never be discriminated against by experiencing the trauma of seclusion or improper restraint. Parents have the right to expect that the school systems they entrust with educating their children do not instead punish their children for having a disability."[3]

12.     The mistreatment of A.A. was not an aberration. Nationally, children with disabilities are disproportionately subjected to physical and mechanical restraints.[4] During the 2022-2023 school year, twenty percent of children restrained with metal handcuffs in New York City Public Schools were children experiencing emotional distress. [5]

---

[1] 8 N.Y.C.R.R. § 19.5.
[2] 8 N.Y.C.R.R. §§ 19.5(c)(2), 155.17(c)(1)(xi).
[3] U.S. Department of Justice, Civil Rights Division *Combating Improper Seclusion in Schools*, (July 3,2025), https://www.justice.gov/crt/schoolseclusion.
[4] U.S. Dep't of Educ., Office for Civil Rights, *Profile of Students with Disabilities in U.S. Public Schools: 2020-21 Civil Rights Data Collection*, *Data Snapshot* (Feb. 2024), https://www.ed.gov/media/document/crdc-student-disabilities-snapshotpdf-21420.pdf.
[5] New York Civil Liberties Union, *Student Safety Act Data 2022-2023*, https://www.nyclu.org/uploads/2013/02/2022-2023_student_safety_act_reporting.pdf.

13.     Children with disabilities, like A.A., are subjected to restraints not because they are a danger, but because their disabilities are misunderstood and mishandled. Such responses reflect disability-based discrimination, where behaviors stemming from a disability are treated as misconduct rather than met with supports and accommodations required by law.

14.     A.A. suffered violent and degrading treatment under the guise of discipline, which violates federal disability rights law, New York State regulations, and the constitutional protections that safeguard students in public schools. This mistreatment did not harm A.A. alone; his mother endured profound distress as she learned her son had been subjected to trauma in the very environment entrusted with his safety. This should put an end to the continued use of unlawful restraints in New York City Public Schools and ensure that children with disabilities receive the supportive services to which they are entitled.

## **PARTIES**

15.     A.A. is a sixteen-year-old minor residing with his parents in Staten Island. He is a student in the New York City public school system and attends Tottenville High School, located at 100 Luten Avenue, Staten Island, New York 10312.

16.     A.A. was diagnosed with Level 3 autism as an infant. He has impairments that substantially limit major life activities. He is minimally verbal, with intellectual and academic skills below those of his peers. A.A. has marked difficulty understanding both verbal and nonverbal communication and requires substantial support at school. As a student with a disability, he receives services under an Individualized Education Program ("IEP") and a Behavior Intervention Plan ("BIP").

17. L.A. is A.A.'s mother and guardian and resides with A.A. in Staten Island, New York.

18. The New York City Department of Education ("NYC DOE") is responsible for the management of the New York City School District and the administration of New York City's public schools. Through the Chancellor's Regulations, the NYC DOE sets policies for New York City's public schools. The NYC DOE maintains its headquarters at 52 Chambers Street, New York, New York 10007. The NYC DOE receives federal funding for its educational services.

19. Defendant Melissa Aviles-Ramos, sued in her official capacity, serves as the Chancellor of New York City Public Schools and is responsible for the operations of New York City Public Schools.

20. Defendant Police Commissioner Jessica S. Tisch is responsible for overseeing and executing the New York City Police Department's ("NYPD") policies. Ms. Tisch has supervisory authority over all officers of the NYPD, a municipal agency of the City. Ms. Tisch is responsible for hiring, training, recruiting, and managing all NYPD officers, including School Safety Agents. She is sued in her official capacity. The NYPD has its principal offices at One Police Plaza, New York, New York 10038.

21. Defendant Roderick Palton, sued in his official capacity, serves as the Superintendent of NYC DOE District 31, and is responsible for the management and delivery of instructional services within District 31 schools. Defendant Palton maintains an office at 715 Ocean Avenue, Staten Island, New York 10301.

22. Tottenville High School is part of District 31 and is subject to the supervision, management, and control of the NYC DOE. At all relevant times, the School's principal was Gina Battista.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4) because this action arises under the laws of the United States.

24.     This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367(a) because they arise from the same facts and circumstances as the federal law claims.

25.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because all events giving rise to the claim occurred in the Eastern District of New York. NYC DOE District 31 and Tottenville High School are both located in this judicial district, and the NYC DOE and NYPD each operate and maintain offices within this judicial district.

26.     Plaintiff is relieved of any administrative exhaustion requirement under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., because this action seeks relief not available under the IDEA, including compensatory damages.

27.     L.A. submitted a timely Notice of Claim to the City of New York and NYC DOE on March 6, 2025, less than 90 days after the events on December 9, 2024, giving rise to the claims.  Multiple attempts to schedule a §50-h hearing with the City went unanswered.

## FACTUAL AND LEGAL BACKGROUND

### Nationwide Recognition of the Harms and Dangers of Restraint

28.     The United States Government Accountability Office ("GAO") and New York State regulations define physical restraint as "a personal restriction that immobilizes or reduces the ability of a student to move his or her torso, arms, legs, or head freely." Mechanical restraint is

defined as the use of any device or equipment to restrict a student's freedom of movement.[6]

29.     Fifteen years ago, a GAO report documented the disturbing and inappropriate use of restraint nationwide. The report described a broad consensus that the risks of injury to children subjected to restraint were unjustifiable. Many of the children restrained were students with disabilities who were not physically aggressive, and parents often had not consented. Even absent physical injury, the GAO report emphasized the significant emotional trauma caused by restraint.[7]

30.     In 2012, the United States Department of Education issued guidance urging schools to avoid using seclusion and to refrain from using restraint as punishment or discipline, noting that restraint should never be used in a manner that restricts a child's breathing or harms the child, and that school districts should use the least restrictive technique necessary to end the threat of imminent danger or serious physical harm.[8] The guidance emphasized that behavioral interventions must be consistent with every child's right to dignity and freedom from abuse. In 2016, the Department of Education's Office for Civil Rights reiterated that the use of restraint may constitute unlawful discrimination against students with disabilities.[9]

31.     In recent years, the United States Department of Justice's Civil Rights Division has enforced Title II of the ADA to combat the improper restraint of students with disabilities in schools.[10] The DOJ has entered into settlement agreements with school districts in nine states— Alaska, Florida, Kansas, Kentucky, Indiana, Iowa, Maryland, Michigan, and Washington—

---

[6] U.S. Dep't of Educ., *2017–2018 Civil Rights Data Collection: The Use of Restraint and Seclusion on Children with Disabilities in K-12 Schools* 4 (2020); 8 N.Y.C.R.R. § 19.5(b)(4) & (7).
[7] U.S. Gov't Accountability Off., GAO-09-719T, *Seclusions and Restraints: Selected Cases of Death and Abuse at Public and Private Schools and Treatment Centers* 1 (2009).
[8] U.S. Dep't of Educ., *Restraint and Seclusion: Resource Document* 11–23 (2012).
[9] U.S. Dep't of Educ., *Dear Colleague Letter: Restraint and Seclusion of Students with Disabilities* (Dec. 28, 2016).
[10] U.S. Dep't of Justice, Civil Rights Div., *About DOJ's Efforts to Combat Improper Seclusion*, U.S. (July 18, 2025), https://www.justice.gov/crt/about-doj-s-efforts-combat-improper-seclusion.

requiring schools to discontinue the use of restraint unless necessary to address an imminent risk of physical harm that cannot be reasonably addressed through de-escalation techniques.

### New York State and City Take Action to Prevent the Use of Restraint on Students

32.      In July 2023, the New York State Board of Regents amended Title 8, Section 19.5 of the Rules of the Board of Regents to align state policy with the U.S. Department of Education's principles on creating safe and supportive learning environments.[11]

33.      These amendments were also prompted by the findings of the *Albany Times Union*, which conducted a years-long investigation of the use of timeout, seclusion, and restraint in New York State schools.[12] The *Times Union* uncovered widespread use of these practices in non-emergency situations, noted likely underreporting, and documented parental reports of severe trauma inflicted on children by these practices.

34.      The 2023 amendments defined behavior management techniques as those designed to help students regulate emotions and behaviors in order to reduce present or potential danger. [13] The amendments expressly prohibit prone restraint in New York schools and impose new protections and requirements limiting the use of physical restraint.[14] The revised regulations became effective on August 2, 2023.

35.      The New York State Department of Education has since issued guidance clarifying that physical restraint is permissible only by trained individuals, only when necessary to protect the student or another person, and only when less restrictive alternatives cannot reasonably be employed. Any physical restraint technique must be the least restrictive technique necessary.[15]

---

[11] Memorandum from Angelique Johnson Dingle to the Honorable Members of the Board of Regents 2 (July 13, 2023) (on file with the New York State Education Department).
[12] *Id.* at 3.
[13] 8 N.Y.C.R.R. § 19.5(b)(3).
[14] 8 N.Y.C.R.R. § 19.5(d).
[15] N.Y. Educ. Dep't, *Updates to Behavioral Supports and Interventions in Schools: Frequently Asked Questions* 3-4, 6 (2024).

36.    Under the guidance, mechanical restraints are deemed aversive interventions and are strictly prohibited, except when a school resource officer effectuates a lawful arrest and handcuffs are necessary for safety.[16] If an arrest is not being made, school resource officers, as agents of the school, must comply with all NYSED regulations, including prohibitions on corporal punishment, aversive interventions, and mechanical restraints.

37.    NYC DOE's Chancellor's Regulation A-411 similarly restricts the use of corporal punishment, prone restraint, aversive interventions, and mechanical restraints in accordance with state regulations. It prohibits school staff from using physical restraint and limits non-NYC DOE personnel to using physical restraints only if properly trained and only when other less restrictive interventions would not prevent imminent serious physical harm.

38.    The Chancellor's Regulation further requires that if a crisis cannot be resolved under the crisis intervention plan, the principal or designee must be contacted to determine next steps.

39.    Finally, the Chancellor's Regulation makes clear that school staff may not direct non-school personnel, such as a School Safety Agent, to restrain a student before the principal or designee has been consulted.

### A.A.'s Enrollment at Tottenville's Alternate Assessment Program

40.    On November 4, 2024, A.A. was accepted to Tottenville's Alternate Assessment Program. He formally enrolled on November 25, 2024, and began attending the next day.

41.    Prior to this placement, A.A. attended the NYC DOE's District 75. However, L.A. believed that A.A. could be more appropriately challenged both academically and functionally in a more inclusive setting.

---

[16] *Id.* at 2-3,7.

42.     In September 2024, following a classroom observation in which A.A. exceeded expectations, he was offered admission to the ACES Program at McKee High School. ACES serves students with intellectual or multiple disabilities and emphasizes inclusion with general education peers. L.A. declined this placement because the commute from home to the school exceeded one hour.

43.     L.A. subsequently applied to Tottenville's Alternate Assessment Program, which is located only a few blocks from their residence.

44.     The Alternate Assessment Program at Tottenville is an inclusive program designed for students with cognitive disabilities who present deficits in communication and adaptive behavior. The program purports to provide a highly specialized curriculum focused on both life skills and academics.

45.     L.A. spoke extensively with the Assistant Principal of Instructional Support Services, Alexandra Mercil ("Assistant Principal Mercil"), prior to enrolling A.A. at Tottenville. During a tour of the school, L.A. specifically asked what the protocol was regarding students in crisis. Assistant Principal Mercil told L.A. that students have access to a calming room and to the crisis intervention team.

46.     At no time prior to enrollment was L.A. informed that A.A. might be subjected to physical or mechanical restraint, and certainly not for non-violent, non-threatening behavior that was well documented in his Behavior Intervention Plan.

**The December 9, 2024 Unlawful Restraint and Surrounding Events**

47.     On December 9, 2024, at approximately 12:15 p.m., A.A.'s 1:1 paraprofessional Angelo Novello, called L.A. and claimed that without provocation, A.A. had struck him and

attempted to bite and headbutt him and the classroom paraprofessional. He further claimed to L.A. that school safety had been called and that thereafter A.A. was placed in handcuffs.

48.     Angelo told L.A. that she needed to come to the school right away because A.A. was about to be arrested.

49.     L.A. was shocked and devastated by these claims, as A.A. had never engaged in biting or headbutting at home or at school.

50.     When L.A. arrived at Tottenville, A.A. was sitting in an office with multiple School Safety Agents and Angelo. A.A. was crying. He was not arrested and was no longer in handcuffs, but visible marks remained on his wrists.

51.     L.A. spoke with Level 3 School Safety Agent Peter Mattera ("SSA Mattera.") She asked him if he knew that A.A. was autistic. He responded that he was told the child was a danger and that SSAs do what they are told.

52.     SSA Mattera admitted that A.A. was handcuffed and stated that it was only for approximately two minutes.

53.     L.A. also spoke with Assistant Principal Mercil, who inappropriately and without basis, stated to L.A. that she should have warned staff that A.A. was a headbutter and biter. L.A. replied that A.A. had never exhibited such behaviors.

54.     When L.A. asked whether it was school protocol to handcuff dysregulated children, Assistant Principal Mercil replied that it was. This not only directly contradicted New York State and the NYC DOE's Chancellor's Regulations, but also contradicted what Assistant Principal Mercil had told L.A during her tour of the school, when she assured her that students had access to a calming room and a crisis intervention team.

55.     Seeking to understand what had triggered him, L.A. asked to review the surveillance footage. School staff agreed but cautioned that the incident might be difficult to see because it occurred in Staircase E.

56.     As A.A. was visibly upset and crying, L.A. decided to take him home, a few blocks away. She and her husband returned to the school about ten minutes later to speak with the school staff, but they were made to wait for nearly two hours.

57.     Finally, L.A. met with a male dean (name unknown), SSA Mattera, and Assistant Principal Mercil.

58.     The portion of the footage that was played showed A.A. walking in the hallway with his classmates from gym class. He was wearing his coat. Angelo, his 1:1 paraprofessional, was not standing near him.

59.     The video further showed the classroom paraprofessional holding the stairwell door open while A.A., as he passed, tapped her shoulders, behavior documented in his Behavior Intervention Plan, which should be known to Angelo.

60.     Rather than redirecting A.A., as required by his Behavior Intervention Plan, Angelo slapped A.A.'s hand down and forcibly restrained him, by pressing him face-first against the wall and pinning his elbows into A.A.'s neck. At this point, A.A. repeatedly turned his head left and right in confusion and fear. However, he neither headbutted nor attempted to bite anyone—contrary to Angelo's account.

61.     L.A. was shocked by the footage, both because of the violence demonstrated against her son and because it flatly contradicted Angelo's false statements. The video did not show any biting or headbutting or violent or threatening behavior of any kind by A.A. Instead, it showed Angelo's conduct, which was overly forceful, excessive, and wholly inappropriate.

62.     At this point in the footage, the dean paused the video and refused to show L.A. the remainder, claiming that the presence of other students did not allow them to do so, contrary to United States Department of Education guidance.[17] L.A. informed Assistant Principal Mercil that A.A. would not return to school until she was permitted to view the full recording.

63.     That day while at the school, A.A.'s father photographed the School Safety Division Criminal Incident Report lying on a desk. That report stated that SSA Rivera restrained A.A. with metal handcuffs for five to ten minutes. The report also stated that there was no police department action and that the matter was handled administratively.

64.     The next day, December 10, 2024, Assistant Principal Mercil called L.A. and invited her back to view the rest of the footage.

65.     On December 11, 2024, L.A. and A.A.'s father returned to Tottenville to watch the rest of the video.

66.     L.A. and A.A.'s father met with School Principal Gina Battista, Dean Michael Gregorio, Assistant Principal Mercil, Assistant Principal Cliff Bloom, and SSA Mattera.

67.     Before resuming the video, Dean Michael Gregorio informed the parents that A.A. would be suspended because, in his view, even students with disabilities needed to be held "accountable" for their actions.

68.     L.A. was distraught by the insensitive comment and by the Defendants' own attempt to avoid accountability. She asked that the video be replayed from the beginning so she could highlight the staff's misconduct.

---

[17] U.S. Dep't of Educ., *Letter to Wachter* (Dec. 7, 2017). When a video is an education record of multiple students, the Family Educational Rights and Privacy Act generally requires the agency to allow the parent of the student to whom the video directly relates to inspect and review it.

69.     From the point where the video had been stopped the day before, it showed a front-desk staff member entering the area and speaking into his walkie-talkie.

70.     Moments later, the footage showed Dean Matthew Galati approaching Angelo and A.A., placing his arm around A.A.'s neck in a chokehold, and dragging him.

71.     A.A. appeared terrified as the dean seized him.

72.     Distressed by witnessing her son's assault, L.A and A.A.'s father could not continue watching and therefore did not see the following portion of the video, which showed SSA Rivera placing metal handcuffs on A.A. despite A.A. not presenting a danger to others or attempting to attack or harm school staff.

73.     A.A. did not attend school in the weeks following the incident, both because of his emotional distress and because L.A. wanted the school to convene a meeting to develop a plan to ensure his safety going forward.

74.     On January 10, 2025, L.A. met with school staff to discuss reintegration strategies. At the meeting, staff admitted that the initial report of A.A.'s behavior on December 9, 2024, which had been used to justify the unlawful restraint, was inaccurate. They further stated that A.A. was a pleasure to have in the classroom, and that a December 10, 2024 notice previously sent to L.A. accusing A.A. of student-to-student harassment had been issued in error. Although A.A. had never been formally suspended, staff conceded that it was inappropriate even to have suggested such a consequence.

75.     The NYC DOE further agreed to assign A.A. to a significantly more experienced paraprofessional, to permit additional in-school support from his outside service providers, and to ensure that Dean Galati would no longer have contact with him.

## Impacts of the December 9, 2024 Event on A.A.

76.     When A.A. returned home on December 9, 2024, he repeatedly complained of pain in his neck and wrists.

77.     As a result of his complaints, A.A. was brought to a local urgent care, where he was treated for abrasions on both wrists.

78.     Following the chokehold and handcuffing, A.A. experienced severe emotional distress. He cried uncontrollably for approximately two weeks. Thereafter, he became increasingly angry and began having outbursts that caused the family to cancel a planned visit with relatives during the school holiday break. He subsequently grew depressed and no longer appeared to enjoy the activities he typically loved.

79.     A.A. also experienced significant developmental regression. He spoke fewer words, relied more heavily on gestures, and struggled academically, losing progress he had previously made. At school, he began displaying new maladaptive behaviors, including punching and throwing himself on the floor. At home, he lost functional skills in daily living, including showering independently and preparing simple meals.

80.     At the January 10, 2025 meeting, one of his after-school Special Education Teacher Support Services providers corroborated this regression and reported that his functional and behavioral setbacks were significant.

81.     Subsequently, due to A.A.'s chronic anxiety and fearfulness, combined with his significant functional regression following the incident, he was diagnosed with post-traumatic stress disorder.

82.     As a result of the NYC DOE's actions, A.A. has suffered physical pain, lasting emotional trauma, and profound disruption to his developmental progress.

83.     L.A. has also experienced ongoing emotional distress. The video replays in her mind. She feels profound guilt for having placed A.A. in a school where this occurred.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 504 of the Rehabilitation Act

84.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1-83 above.

85.     The Rehabilitation Act of 1973 prohibits discrimination on the basis of disability in programs receiving federal financial assistance.  *See* 29 U.S.C. § 701 *et seq.*

86.     Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794, provides, "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

87.     For purposes of Section 504, an "individual with a disability" is defined in accordance with the Americans with Disabilities Act, 42 U.S.C. § 12102(1), as an individual with a physical or mental impairment that substantially limits one or more major life activities of such individual; with a record of such an impairment; or who is regarded as having such an impairment.

88.     A.A. is an individual with a disability within the meaning of Section 504 and is entitled to its protections.

89.     Defendants, in operating and managing a school that receives federal financial assistance, are subject to Section 504's requirements.

90.     Defendants violated A.A.'s rights under Section 504 by subjecting him to unlawful restraint—a measure that excluded him from his education rather than providing the support and services required in school to foster a safe, non-discriminatory, and least restrictive environment.

91.     By restraining A.A. without lawful basis and treating disability-related behaviors contemplated in a Behavior Intervention Plan as threatening conduct, Defendants excluded him from participation in a federally funded program and denied him educational benefits and opportunities, thereby creating a hostile and discriminatory learning environment.

92.     Defendants acted with deliberate indifference to A.A.'s federally protected rights and the obvious, foreseeable harm their conduct would cause.

93.     As a direct or proximate result of Defendants' unlawful and discriminatory acts, A.A. suffered physical pain, emotional distress, developmental regression and lasting educational harm.

## COUNT II
### Violation of Title II of the ADA

94.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1-93 above.

95.     Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, prohibits discrimination on the basis of disability by public entities, including public educational institutions.

96.     42 U.S.C. §12132 provides, "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

97.     A.A. is a "qualified individual with a disability" within the meaning of the ADA and its implementing regulations.  *See* 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104; 42 U.S.C. § 12102.

98.     Defendants, as state actors operating a public school, are public entities subject to the requirements of Title II of the ADA.

99.     Defendants violated A.A.'s rights under the ADA by unlawfully restraining him on account of his disability rather than providing the supports and accommodations necessary to allow him to access his education in the least restrictive environment.

100.    Defendants further violated the ADA by subjecting A.A. to physical and mechanical restraint because of his disability and disability-related behaviors. A.A.'s tapping a staff member on the shoulder was met with force that, upon information and belief, is not used against students without disabilities who engage in comparable conduct, nor was it appropriate given that this behavior was an ordinary, non-aggressive behavior by A.A. that was contemplated in his Behavior Intervention Plan.

101.    By using restraint as a punitive measure disproportionately against students with disabilities, Defendants treated students with disabilities differently from students without disabilities and created a discriminatory and hostile educational environment.

102.    Defendants failed to adequately train, supervise, and hold their employees accountable for discriminating against students with disabilities.

103.    Defendants acted with deliberate indifference to A.A.'s federally protected rights and to the foreseeable harms caused by their actions.

104.     As a direct or proximate result of Defendants' unlawful and discriminatory acts, A.A. suffered physical pain, emotional distress, developmental regression and lasting educational harm.

### COUNT III
### 42 U.S.C. § 1983 Violation of the Fourth Amendment

105.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1-104 above.

106.     Under 42 U.S.C. § 1983, any person acting under color of law who subjects, or causes to be subjected, another to the deprivation of rights secured by the Constitution is liable to the injured party.

107.     The Fourth Amendment of the United States Constitution guarantees the right to be free from unreasonable searches and seizures, including unreasonable and excessive use of force.

108.     The Fourth Amendment applies to public school officials and employees acting under color of state law.

109.     A.A. has a constitutional right to be free from the use of unreasonable force and unlawful seizure by school employees and School Safety Agents acting under color of law.

110.     Defendants, acting under color of law, violated A.A.'s Fourth Amendment rights when he was unlawfully restrained in contravention of federal, state, and local laws and policies.

111.     Defendants' use of force was excessive and unreasonable under the circumstances. At no point did A.A. pose a danger to anyone.

112.     Any reasonable NYC DOE employee or School Safety Agent in the same position would have known that the conduct complained of herein was unconstitutional.

113. Further, upon information and belief, Defendants have a policy of handcuffing children in crisis, as reflected by the Student Safety Act data and L.A.'s communication with school staff.

114. Defendants' obligation to be familiar with A.A.'s Behavior Intervention Plan, and their disregard for it, underscores the outrageous and unlawful nature of Defendants' conduct.

115. Defendants' conduct was intentional, malicious, and in reckless disregard of A.A.'s constitutional rights.

116. As a direct or proximate result of Defendants' unlawful and discriminatory acts, A.A. suffered physical pain, emotional distress, developmental regression and lasting educational harm.

## COUNT IV
### Violation of the New York State Constitution

117. Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1-116 above.

118. Article I, Section 12 of the New York State Constitution guarantees the right of individuals to be secure in their persons and to be free from unreasonable searches and seizures.

119. A.A. has the right under the New York State Constitution to be free from unreasonable seizure and excessive restraint by public employees acting under color of state law.

120. Defendants violated A.A.'s right under Article I, Section 12 when school staff and School Safety Agents restrained him without lawful justification and placed him in handcuffs.

121. Defendants' actions were unreasonable and unjustifiable under the circumstances, as A.A. posed no imminent danger that could not have been addressed through less restrictive means.

122. The NYC DOE, as the employer of those who unjustifiably seized A.A., is responsible for their misconduct under the doctrine of *respondeat superior*.

123. The NYPD, as employer of SSA Rivera, who unlawfully restrained A.A. with metal handcuffs, is responsible for this misconduct under the doctrine of *respondeat superior.*

124. Furthermore, upon information and belief, Defendants have a custom and policy of restraining students with disabilities in violation of their constitutional rights, as reflected by data and L.A.'s communication with school staff.

125. Defendants failed to follow applicable state and local statutes, regulations, and policies governing the use of restraint in schools.

126. Defendants failed to adopt adequate policies and/or failed to provide proper training to staff regarding appropriate interventions with students with disabilities. These failures were a direct or proximate cause of the constitutional deprivation inflicted upon A.A.

127. As a direct or proximate result of Defendants' unlawful and discriminatory acts, A.A. suffered physical pain, significant emotional distress, developmental regression, and lasting educational harm.

## COUNT V
### False Arrest

128. Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1-127 above.

129. Under New York common law, false arrest occurs when a person is intentionally confined without consent and without lawful justification.

130. A.A. was unlawfully seized, restrained, and handcuffed by school staff and School Safety Agents without lawful justification.

131. A.A. did not consent to the unlawful seizure or confinement.

132.    Defendants' actions were unreasonable and unjustifiable, as A.A. posed no imminent danger that would justify such restraint or confinement.

133.    The NYC DOE, as the employer of those who unjustifiably seized A.A., is responsible for their misconduct under the doctrine of *respondeat superior*.

134.    The NYPD, as the employer of SSA Rivera, the School Safety Agent who handcuffed A.A., is responsible for this wrongdoing under the doctrine of *respondeat superior.*

135.    As a direct or proximate result of Defendants' actions, A.A. suffered physical pain, emotional distress, developmental regression, and lasting educational harm.


## COUNT VI
### Assault and Battery

136.    Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1-135 above.

137.    Under New York common law, assault occurs when a defendant intentionally places another person in reasonable apprehension of imminent harmful or offensive contact. Battery occurs when a defendant intentionally makes harmful or offensive physical contact with another without consent or lawful justification.

138.    Angelo Novello, Dean Matthew Galati, and School Safety Agent Rivera all acted within the scope of their employment when they unlawfully restrained A.A.

139.    Defendants' employees intentionally placed A.A. in fear of imminent harmful contact and then physically struck, restrained, and choked him.

140.    School Safety Agent L. Rivera likewise intentionally handcuffed A.A. without lawful justification.

141. These actions were neither consented to by A.A. nor justified under the circumstances, and they constituted unlawful assault and battery under New York common law.

142. The NYC DOE, as the employer of school staff who unjustifiably restrained A.A., is liable for their misconduct under the doctrine of *respondeat superior*.

143. The NYPD, as employer of SSA Rivera, the School Safety Agent, who handcuffed A.A., is responsible for this misconduct under the doctrine of *respondeat superior.*

144. The restraint was not privileged and violated New York law, including but not limited to, 8 NYCRR § 19.5.

145. As a direct or proximate result of Defendants' actions, A.A. suffered physical pain, emotional distress, developmental regression and lasting educational harm.


## COUNT VII
### Intentional Infliction of Emotional Distress

146. Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1-145 above.

147. Under New York common law, a defendant is liable for intentional infliction of emotional distress where the defendant, by extreme and outrageous conduct, intentionally or recklessly causes severe emotional distress.

148. Defendants, by unlawfully restraining A.A., engaged in conduct that was extreme, outrageous, and beyond the bounds of all decency tolerated in a civilized society.

149. Defendants knew or recklessly disregarded that A.A. was a child with severe autism, that he was minimally verbal, and that their conduct would foreseeably cause him severe emotional and psychological harm.

150. Defendants' actions were intentional and/or taken with reckless disregard and were in clear violation of New York State rules and regulations.

151. As a direct or proximate result of Defendants' extreme and outrageous conduct, A.A. suffered severe emotional distress, trauma, and lasting psychological harm.

## COUNT VIII
### Negligent Infliction of Emotional Distress

152. Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1–151 as if fully stated herein.

153. Under New York common law, a defendant is liable for negligent infliction of emotional distress where the defendant's conduct unreasonably endangered the plaintiff's physical safety or caused the plaintiff to fear for his or her safety, or where the defendant's actions were so careless that they unreasonably endangered the plaintiff.

154. Defendants owed A.A. a duty of reasonable care to provide a safe and supportive educational environment and to protect him from foreseeable harm.

155. Defendants breached this duty by unlawfully restraining A.A., despite knowledge of his disability and his Behavior Intervention Plan.

156. Defendants' conduct unreasonably endangered A.A.'s physical safety and caused him to fear for his life and bodily integrity.

157. As a direct or proximate result of Defendants' negligence, A.A. suffered severe emotional distress, trauma, and developmental regression.

## COUNT IX
## Negligent Hiring, Training and Supervision of Employees

158. Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1-157 above.

159. Under New York common law, an employer may be held liable for negligent hiring, training, and supervision of employees.

160. Defendants owed a duty of care to A.A. and other students with disabilities to hire, train, supervise, and retain only those employees who were fit to work safely and appropriately with vulnerable students.

161. Defendants also owed a duty of care to ensure that their employees, contractors, agents, and other staff in charge of supervising children, were aware of all laws and regulations regarding the prohibition of corporal punishment, aversive interventions, and unlawful restraint.

162. Defendants breached that duty by hiring, training, and supervising school staff and School Safety Agents who lacked the experience, training, and judgment necessary to safely and lawfully support A.A. in school.

163. Defendants failed to adequately train their employees on lawful and appropriate methods of behavioral intervention, de-escalation, and restraint, particularly with respect to students with disabilities and individualized Behavior Intervention Plans.

164. Defendants failed to adequately train their employees on how to safely and appropriately interact with students with disabilities like A.A., including training on autism and disability-related behaviors. Defendants' failure to provide such training foreseeably resulted in staff responding with unjustified force driven by stigma and misunderstanding, rather than employing the supportive strategies required for students with autism.

165.     Defendants knew or should have known that the employees involved in the incident lacked the training and judgment necessary to safely support A.A. and that their failure to intervene appropriately posed an unreasonable risk of harm.

166.     As a direct or proximate result of Defendants' actions, A.A. suffered physical pain, emotional distress, developmental regression, and lasting educational harm.

## COUNT X
### Violation of the New York State Human Rights Law

167.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1-166 above.

168.     The New York State Human Rights Law ("NYSHRL") imposes a "responsibility to act to assure that every individual within this state is afforded an equal opportunity to enjoy a full and productive life and that the failure to provide such equal opportunity, whether because of discrimination, prejudice, intolerance, or inadequate education . . . not only threatens the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety, and general welfare of the state and its inhabitants."  N.Y. Exec. L. § 290(3).

169.     Under Executive Law § 296, NYSHRL specifically prohibits discrimination on the basis of disability in places of public accommodation, including educational institutions.

170.     A.A. is an individual with a disability within the meaning of the NYSHRL.

171.     Defendants, in their operation and management of a public school, are subject to the NYSHRL and are prohibited from discriminating against students with disabilities.

172.     Defendants discriminated against A.A. by unlawfully restraining him on account of his disability, instead of providing reasonable accommodations and appropriate supports required under his Individualized Education Program and Behavior Intervention Plan.

173.     Defendants further discriminated against A.A. by subjecting him to physical and mechanical restraint because of his disability-related behaviors. Such force, upon information and belief, is not used against students without disabilities who engage in comparable conduct.

174.     By using restraint as a punitive measure disproportionately against students with disabilities, Defendants treated students with disabilities differently from students without disabilities and created a discriminatory and hostile educational environment.

175.     Defendants' conduct excluded A.A. from full and equal participation in, and enjoyment of, educational services, facilities, and opportunities available to students without disabilities.

176.     Defendants have undermined the purpose of the NYSHRL and are therefore liable for unlawful disability discrimination under N.Y. Exec. L. § 296.

177.     As a direct or proximate result of Defendants' actions, A.A. suffered physical pain, emotional distress, developmental regression, and lasting educational harm.


## COUNT XI
### New York City Human Rights Law

178.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1-177 above.

179.     The New York City Human Rights Law ("NYCHRL") provides that it is an unlawful discriminatory practice for any place of public accommodation, including public

schools, to deny any person the full and equal enjoyment of services, facilities, and accommodations on the basis of disability. N.Y.C. Admin. Code §8-101 *et seq*.

180.    A.A. is an individual with a disability within the meaning of NYCHRL.

181.    Defendants, in their operation and management of a public school, are subject to the NYCHRL and are prohibited from discriminating against students.

182.    Defendants unlawfully discriminated against A.A. by unlawfully restraining him on account of his disability, rather than providing reasonable accommodations and supports, consistent with his Individualized Education Program and Behavior Intervention Plan.

183.    Defendants further discriminated against A.A. by subjecting him to physical and mechanical restraint because of his disability-related behaviors. Such force, upon information and belief, is not used against students without disabilities who engage in comparable conduct.

184.    Defendants' conduct created and perpetuated a hostile and unequal educational environment that denied A.A. full and equal enjoyment of educational opportunities and services.

185.    As a direct or proximate result of Defendants' unlawful conduct, A.A. suffered physical harm, emotional distress, and denial of equal educational opportunities.


## COUNT XII
## Declaratory Relief for Violations of Federal and State Law

186.    Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1–185 above.

187.    Plaintiff requests a declaration that the Defendants violated Section 504 of the Rehabilitation Act, Title II of the ADA, the Fourth Amendment, Article I, Section 12 of the New

York State Constitution, the New York State Human Rights Law, the New York City Human Rights Law, and New York State's Rules of the Board of Regents.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

a) Assume jurisdiction of this action;

b) Enter a declaratory judgment that the Defendants' acts and omissions complained of herein violated Section 504 of the Rehabilitation Act, Title II of the ADA, the Fourth Amendment, Article I, Section 12 of the New York State Constitution, the New York State Human Rights Law, the New York City Human Rights Law, and New York State's Rules of the Board of Regents;

c) Award A.A. compensatory damages against the NYC DOE and NYPD in an amount to be determined at trial;

d) Award A.A. reasonable attorney's fees and expert witness costs from the NYC DOE, including the fees and costs incurred in this action;

e) Enjoin Defendants from further use of inappropriate violence and unlawful restraint against A.A. and all students in New York City Public Schools; and

f) Enter an order requiring that all staff who interact with A.A. receive comprehensive training;

g) Enter an order requiring Defendants to develop, submit, and implement a corrective action plan addressing: compliance with NYSED restraint regulations, proper crisis intervention procedures, mandatory staff training requirements, and oversight mechanisms to monitor ongoing compliance;

h) Award such other relief as the Court deems necessary and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: New York, New York
December 4, 2025

**LEGAL SERVICES NYC**

By:

    M'Ral Broodie-Stewart
    Robert Sanderman
    60 Bay Street
    Suite 900
    Staten Island, New York 10301
    Telephone: 718-233-6480
    Fax: 718-233-6462
    Mbroodie-stewart@lsnyc.org

    Christopher A. Suarez (*pro hac vice* forthcoming)
    Steptoe LLP
    1330 Connecticut Ave.
    Washington DC 20036
    Telephone: 202-429-8131
    csuarez@steptoe.com

    Elinoam Abramov (*pro hac vice* forthcoming)
    Steptoe LLP
    1114 Avenue of the Americas
    New York NY 10036
    Telephone: 212-378-7607
    eabramov@steptoe.com

    *Attorneys for Plaintiff*